The next case on the calendar is United States v. Shkreli. Good morning, Your Honors. May it please the Court, I am Mark Baker. And along with my colleagues Andrea Zellin and Terry Garagos, we represent Martin Shkreli. I respectfully submit that the split verdict in this case speaks volumes as to the care the jury took in listening to the Court's every word. After all, how many times has been there a case where the same instruction was given two different ways as to two separate frauds with two disparate results based on the same conduct? As to the securities counts, those charges where there was no ultimate harm given, there was acquittal. Those charges where it was given with the Berkowitz language, there was an acquittal. Those charges where the Berkowitz language was omitted as in Rosamondo, it was a duplicate of Rosamondo, there was conviction. And as to the count eight, there was immediately followed a third repetition of the charge because it was immediately followed with a good faith defense. We asked the Court to first hold that a no ultimate harm instruction is inappropriate with regard to the security fraud under 15 U.S.C. 78JB. Mr. Baker, when you look at our decisions in Leonard and Lang, both of those cases were wire fraud and securities fraud cases. And in both of those situations, this Court said that it was okay to give the no ultimate harm instruction. So I was having a hard time understanding why this case is any different from these other cases where we previously said that it makes sense to give it even in the securities fraud context. Well, in those cases, Judge Bianco, there was no pointed instruction as to security fraud or to wire fraud. It was a conflated instruction regarding the good faith defense where there was no specific instruction as to security fraud here and as to wire fraud there. Arguably, this was better to distinguish them to make it clear that with respect to wire fraud, the last sentence of the wire fraud no ultimate harm instruction said that you have to show an intent to cause harm where for security fraud, that's not an element. To just give a general instruction is arguably more confusing to a jury than to give two separate instructions that focus on what is an element and not an element independent of the issue of no ultimate harm. Well, I mean, you said it yourself. Securities fraud does not contain the element of intent to defraud like a wire fraud or mail fraud. You have to intend to deceive in connection with the security, you have to for security fraud. There has to be misrepresentation, deception, but there's no mendraya of intent to defraud. So if the instruction requires looking at whether or not there was actual intent, you're reading an element into the statute that doesn't exist. Look at what happened in, you mentioned Lange, okay? So in Lange, the court said a no ultimate harm instruction given by the district court is proper where there was sufficient factual predicate to necessitate the instruction to the instruction required the jury to find intent to defraud to convict. And in this case, there was an isolated charge as to wire fraud on the one hand, security fraud on the other hand. But security fraud doesn't require the intent to defraud and Lange said that's where you give it. The jury might be confused, especially, I went back with Mr. Brofman's summation. He made the argument, for example, with respect to one investor, he gave 300,000, he got 1.5 million. Would you take that deal, ladies and gentlemen of the jury, arguing to the jury that because they made money, how could it be a fraud? So if that type of argument is made, someone has to tell the jury just because the investor ultimately made money doesn't mean it's not wire fraud or security fraud. Otherwise, a juror could easily believe, look, how could it be security fraud if the investor made money? Why is it that where the jury was instructed as to wire fraud, the language with Berkowitz, you have to find at least a purpose of causing a loss. But that's an element of... But they acquitted in those elements, on those counts, whereas on the security fraud, where the for the purpose of causing a loss language was left out, as in the Roman Zimando case, there they convicted. But a belief that no one will ultimately be harmed is not a defense to a securities fraud case, correct? No, it's appropriate with respect to good faith. If you're using it in that context, it's an appropriate instruction. But when you're isolating it and you're pointing it towards security fraud where intent to defraud is not an element, that's requiring the jury to view it in regard to an element that doesn't exist. That's confusing. And what happened here? The jury obviously was confused because they came back and one of the only notes they said was, please explain fraudulent intent. So what did the judge do? She said, go read page 41 and 68 of my instructions where we have the same dichotomy that I'm trying to address, whereas security fraud, no Berkowitz language, mail fraud, yes. Now if intent to defraud, and it really comes down to this, Judge Bianco, if you accept the premise as in Lange, which you referenced to me, requires an intent to defraud and security fraud does not have that as an element, then why is Lange germane? It's not because it was bundled. As a matter of fact, the U.S. Attorney in summation or rebuttal summation talked about frauds in this case in general. There was no discrepancy between the wire fraud and the mail fraud. That came only when the jury was instructed and they were asked to deliberate. So if they're asked to deliberate about finding, if you find intent to defraud in a crime where that's not an element, why is that relevant? Why is that not confusing? All the time have to explain something that's not an element to avoid confusion. For example, interstate commerce, you tell a jury there's no knowledge requirement for interstate commerce. It's just an element. So even though there's no knowledge issue in the law, you have to make sure that the jury's not going to be confused by thinking there is one, because it might be natural to believe that in a securities fraud case, if you don't lose money, it's not a crime. So even though it's not an element, doesn't mean it's not something that the jury does not need to have explained, especially when arguments are being made about how people made money. If it was done the way it was done in Lange and Leonard, I would be less able to complain. I mean, I'd complain anyway because that's my job. But if it was in that way put to the jury, and you find in regard to the good faith defense, and not isolating it as to security frauds here and wire fraud there, two different ways of describing it. We'd have a different conversation. But that's not what was done here. And the jury obviously was confused because that was their note. And what was the reason? They indicate confusion. They just asked for an explanation of the- Well, it's an indication of some confusion. Otherwise, they wouldn't have asked for it. Some, look, I understand- Also, on the split verdict, the government points out, I mean, that it could be because they didn't believe there was a conspiracy, that they believed Mr. Shkreli was the mastermind. I think there's only one way to explain the split verdict. On the same conduct with regarding two different offenses, one involving a mens rea element and one not. How can a jury come back and say guilty of security fraud, not guilty of wire fraud with respect to the same allegation? It doesn't make any sense unless they were confused and understood or believed that with respect to wire fraud, they still had to determine there was an intent to defraud, which they did not have to. And the government's burden was even less in that case. But the jury came up, decided there was, in fact, a fraudulent intent in a statute which doesn't require it, and they convicted. There's no other way to explain it. I see my time is almost up. With respect to the allegation that increases the burden of the government, which is the response of Ms. Smith, the fact of the matter is that they didn't have a burden before they asked for the no ultimate harm charge. Once they did that, then they created a burden for themselves in showing that there, in fact, was a purpose of causing a loss. So the government took on that burden by asking for that instruction. Defense obviously did not, and once that instruction is given, I submit the for the purpose of causing a loss language was necessary and appropriate. Thank you very much. Good morning, may it please the court. My name is Alexandra Smith, and I represent the United States. And I also represented the United States before the district court. I want to just start by addressing two points that my adversary made. The first is that it's incorrect to state that there is no mens rea requirement for securities fraud. The difference in the Sienta requirement for the two different types of fraud, securities fraud versus wire fraud, is that wire fraud also includes the requirement that there be an intent to obtain money or property. That's the additional element that distinguishes, in some ways, between securities fraud and wire fraud. Securities fraud only requires that in connection with the purchase or sale of a security that there be an intent to deceive. And your adversary's argument is because of that difference, it was inappropriate to give a no ultimate harm instruction as to the securities fraud. So I have a couple of responses to that. In the first instance, I do want to just address very quickly the split verdict, and I'll circle back. As Judge Bianco pointed out, for the two hedge fund schemes, there were three counts charged for each scheme. One substantive securities fraud, one wire fraud conspiracy, and one securities fraud conspiracy. And the jury acquitted on the two conspiracy counts and convicted on the substantive securities fraud count. So they actually did acquit him on a securities fraud count for those schemes as well. So I do not think the split verdict- There were two? There were two. Acquittals on securities? Yes, so there were two separate hedge fund schemes. Each scheme charged three counts. And so on each scheme, he was convicted on the securities fraud, the substantive securities fraud count, and acquitted on both wire frauds conspiracy and securities fraud conspiracy. But returning to your question about the intent to defraud language, I think Judge Bianco put it well when he said that this is arguably a better no ultimate harm instruction than the one that was used in Lange and Leonard in the sense that when you're describing no ultimate harm and you're talking about the original standard for what it means to show fraudulent intent. In this case, on the back end, the no ultimate harm instruction was matched to the elements of the crime on the front end. So it is arguably a more precise instruction that was given in Lange and Leonard could be somehow prejudicial or problematic than sort of a more general instruction. In fact, that was what Judge Matsumoto said, was that she wanted to match the no ultimate harm to the original elements of each crime, which is why we wound up with two separate instructions on the two different types of fraud. Was there any objection below where they asked that it be combined and not be separate? I don't remember now whether that issue came up about whether it should be a separate charge or a combined charge. Was there any discussion of that? No, in fact, what wound up happening was that good faith was discussed. It was the, obviously, the defense was good faith was put both in the securities fraud count and the wire fraud count in the jury instructions where it was discussed. So every time the elements of the crime, each crime was discussed, good faith was addressed. For the first six counts, we had asked for no ultimate harm instruction. And so as a result, that no ultimate harm was tied to good faith in each of those six counts. There was a discussion about, defense counsel said that he hadn't thought originally about whether or not it made sense to adjust the standard on the back end to meet the standard on the front end. And in fact, at appendix page 179, counsel identified that we would have two different no ultimate harm instructions. And then on pages 186 to 187, the court explained that she didn't want to import into securities fraud an element required in wire fraud by putting the Berkovich language in the no ultimate harm for the securities fraud count. And the defense counsel responded, well then I think the answer could be that your honor has two no ultimate harm charges. That's sort of the last time the two separate charges were discussed. I know that my adversary in his reply points to pages 190 to 191. There's another discussion about additional Berkovich language there. That discussion is really about a second paragraph that adds this language, which starts as a practical matter then. So after you describe the no ultimate harm instruction, you kind of bring it back to what the government's burden is. And counsel wanted to make sure that that second Berkovich language was in both the wire fraud and the securities fraud no ultimate harm instruction, and it is in fact in both. It is just the language about to obtain money and property that was not put in the no ultimate harm instruction for the securities fraud counts. And I think your honors have noted, but obviously, it is wrong to allow a defendant to make a legally improper argument and not to allow the court or the government to be able to respond. And so not permitting a no ultimate harm instruction in this case would in fact give the defendant a windfall, because he would be better off by making a legally improper argument for which there was no response. Because sometimes I think the terminology, the no ultimate harm, is a little confusing, the word harm. But it's really about vitiating intent. And the idea is that I can't lie to you on day one and tell you, invest with me, I have a million dollars. Or as Mr. Shkreli did, for example, say, I have $100 million. Because I believe on day ten that I may come into that $100 million. It doesn't change my intent on day one when I know that I'm lying because I don't have it yet. And the no ultimate harm instruction prevents the legally improper defense that was advanced here, which is, I eventually believe it will all work out and therefore, I can't possibly have lied to you up front. I just, I do want to just address my adversary's statement that there's no burden before asking for an ultimate harm. The burden that we're talking about is obviously our burden to prove the elements. And so the idea is that on the back end, you're describing an element for securities fraud to obtain money and property that isn't actually an element that we're required to prove. That is what we're talking about when we talk about raising the burden. Can I ask you to address the forfeiture issue for just a moment? And specifically the money invested by those who didn't testify at trial. I think it's Saunders and the ten MSMB healthcare investors. And how we conclude or how the district court probably concluded that they relied on the defendant's misrepresentations. So in the record for witnesses who didn't testify, and I will say there was substantial evidence introduced at trial about Mr. Scully's lies to investors in the private placement memorandum, the document that was used to recruit investors to investors in person. But obviously investors who didn't come and testify in person did not testify that they themselves relied, for example, at the time of the investment on those lies. Although, again, our standard is preponderance in the forfeiture context. And I would argue we had more than amply met that even with all of the evidence about the lies made to induce investors. But what is also in evidence for all of the investors testifying or not testifying are the performance reports that they received throughout their investments. So these were monthly reports that allegedly showed that their investments were gaining when, in fact, for MSMB Capital there was actually no money left in the fund and for MSMB Healthcare. The trading had ceased at some point and all of the funds that remained, which had not otherwise been stolen. And I note that my adversary did not address the fact that Mr. Scully stole from both funds for his own personal use, including $1.1 million from the MSMB Healthcare Fund to pay his personal debts. But those performance statements went to each and every investor. When they invested in the fund, they gave their email address, and then they received these performance reports on a monthly basis. And there was substantial evidence at trial that those were entirely false, that they contained information about the fund's liquidity and the assets that they had that didn't actually match with the assets that the funds actually had. Do your honors have any other questions? Okay, thank you very much. The instruction in Lange on footnote nine simply was, you're instructed with respect to the scheme to defraud does not require you to find good faith. That was it. There was nothing about the elements of the particular crimes. I think the instruction they proposed was the exact instruction from Leonard, wasn't it? Wasn't it the exact words they- No, it was the same instruction given in Rosamondo. I mean, I can- No, I'm talking about on the securities, with respect to securities fraud, the language was the exact language of Leonard. But there was no, in the cases that you're referring to, Judge Bianco, there was no, as I said before, there was no isolated instruction as to each particular offense, thereby creating, to offset an element that doesn't exist. No, but if they gave the instruction for Rosamondo, they would be adding the element that they would have to show for securities fraud. That you have to intend to cause harm. So they'd be adding, that language would be then for securities fraud, which is incorrect as a matter of law. But in putting in the instruction the way it was in Rosamondo, and by the way, if you look at page A190 to 191 of the record, which is quoted in my brief. There, there was a very confusing charge conference because the judge came back and said my law clerk just pointed out there's probably a difference between the two counts. It was left as understood by counsel that the Berkowitz language would be used with respect to each individual set of charges. And it wasn't, because in the final analysis, as to security fraud, it was Rosamondo, and as to wire fraud, it was Berkowitz. I ask you to take a look at that to see. That's my additional point, actually, where at the very least, there should have been the Berkowitz language applied across the board. Berkowitz language, again, has the intent to cause harm language in it, which doesn't apply. So I don't know how it could be. We could tell a district court, you have to apply the Berkowitz language to a securities fraud count, even though there is no intent to cause harm. Because it creates an understanding or confusion in the jury's mind that, in fact, they have to find that. Because it was looking at, they had the language of, in Rosamondo, which I, I don't have it at the moment, where, what did the Rosamondo court say? He said that the jury would have been confused and might have convicted because even if he didn't intend to harm, there was still some sort of misrepresentation made. No securities fraud, that was a mail fraud case. That's correct. That's correct. I understand that. But what I'm saying here is, as we've tried to demonstrate with respect to the differing elements, it becomes irrelevant. That's the point. It's irrelevant to a count that does not have that element in it. And it creates what I submit was the confusion with the jury note. And all I got was, go read back what I gave you. Just one last thing on the forfeiture, Judge Livingston, which you asked about. Whatever the defendant did or did not do, in the final analysis, and this is where we asked the court to embrace the Hollinger holding from the district court in the Midwest. Each of these investors, and there's a chart on page 70 of our brief, made what we described to the district court as robust gains. They made far more than they invested. And if the forfeiture statute for securities requires direct cost to be subtracted from the ultimate gain to arrive at the net amount. The fact of the matter is, all those gains given back to the investors, far more than they ever invested, should wipe out clean the forfeiture obligations of Mr. Shkreli. Thank you very much. Thank you both, well argued. And we'll take the matter under advisement.